IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

_____

No. 15-0115

_____

**FILED**

**June 3, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

TIMOTHY PAUL SHAFER,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Louis Bloom, Judge
Criminal Action No. 14-F-227

AFFIRMED

_____

Submitted: March 3, 2016
Filed: June 3, 2015

Brian D. Yost, Esq.                          Patrick Morrisey, Esq.
Holroyd & Yost                               Attorney General
Charleston, West Virginia                    Katlyn M. Miller, Esq.
Counsel for the Petitioner                   Assistant Attorney General
                                             Charleston, West Virginia
                                             Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

1.    "'The Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands.' Syl. Pt. 1, in part, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997)." Syl. pt. 1, *State v. James*, 227 W. Va. 407, 710 S.E.2d 98 (2011).

2.    "'Sentences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review.' Syllabus Point 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982)." Syl. pt. 6, *State v. Slater*, 222 W. Va. 499, 665 S.E.2d 674 (2008).

3.    "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity, thereby violating West Virginia Constitution, Article III, Section 5 that prohibits a penalty that is not proportionate to the character and degree of an offense." Syl. pt. 5, *State v. Cooper*, 172 W. Va. 266, 304 S.E.2d 851 (1983).

4.    "In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other

i

jurisdictions, and a comparison with other offenses within the same jurisdiction." Syl. pt. 5, *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981).

5. "Life imprisonment without possibility of parole is not cruel and unusual punishment for first-degree murder. U.S.Const. amends. XIV and VIII; W.Va.Const. art. III, § 5." Syl. pt. 1, *State ex rel. Leach v. Hamilton*, 280 S.E.2d 62, 64 (W. Va. 1980).

Benjamin, Justice:

In this appeal, petitioner Timothy Shafer challenges his sentence of life in the penitentiary without mercy for his felony murder conviction. Having carefully reviewed Mr. Shafer's case, we find no error in his sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early 2014, Mr. Shafer was a drug addict, using heroin and methamphetamine. He contends that his girlfriend at the time, Megan Hughes, was also addicted to drugs and that they would use drugs together.

Mr. Shafer, Ms. Hughes, and a friend of the couple, Jessica Wilson, conspired to rob Nancy Lynch ("the victim") of money to buy illegal drugs. The victim was sixty-six years old, and she lived alone with her dog, Hazel, in St. Albans, West Virginia. Mr. Shafer claimed he and Ms. Hughes got the idea to rob the victim after he and Hughes had a chance encounter with the victim. During the encounter, the victim told Mr. Shafer and Ms. Hughes that she had been robbed three or four times in the past but that she did not report the robberies because she feared repercussions from the robbers.

Sometime on the evening of January 3 or 4, 2014, Mr. Shafer and Ms. Wilson decided to rob the victim in her home. Mr. Shafer maintains that he targeted the victim because he did not believe she would report the robbery. There is no evidence in

the record to suggest that Mr. Shafer or Ms. Wilson were under the influence of drugs at this time. Mr. Shafer and Ms. Wilson left on foot from Ms. Wilson's home. According to Mr. Shafer, he took a toy gun and put it in his pants, intending to use it to threaten the victim. He contended that Ms. Wilson took a long kitchen knife and put it in her pants. Neither Mr. Shafer nor Ms. Wilson wore masks or gloves. Mr. Shafer claims that he did not believe any violence would be necessary to rob the victim.

When Mr. Shafer and Ms. Wilson arrived at the victim's home, the victim was not there. They waited for her, and she later returned home from a shopping trip to K-Mart. Mr. Shafer, Ms. Wilson, and the victim spoke together outside the home until Mr. Shafer lifted his shirt so that the victim could see the gun and insisted that they all go into the house. Mr. Shafer later told police that the victim did not take him seriously. In response to the victim's indifference, he asserts that Ms. Wilson pulled the knife out of her pants and pushed the victim inside. Once inside the house, Ms. Wilson demanded money and pills. The victim told Ms. Wilson that she had $13 in her purse, but upon inspection of the purse, Ms. Wilson found $16 and an ATM card. According to Mr. Shafer, Ms. Wilson ordered the victim to provide her with the pin number to the card, but the victim responded with a string of different numbers.

Mr. Shafer theorized that Ms. Wilson was angered by the victim's lies about the amount of money in the purse and the ATM card pin number. He told police

2

that Ms. Wilson told him to look away, and that as soon as he looked away, Ms. Wilson began quickly stabbing the victim in the chest and neck area. Mr. Shafer said he turned around as soon as he heard the stabbing and watched Ms. Wilson stab the victim to death. The victim was stabbed nineteen times. After the victim fell to the floor, Ms. Wilson covered her with a blanket. Ms. Wilson put the victim's dog, which had been outside during the attack, in the house.

Directly after the killing, Mr. Shafer and Ms. Wilson left the victim's house with the victim's ATM card, two pistols, a camera with lenses, jewelry, and prescription medications. They tried to withdraw cash using the ATM card, but the pin numbers they tried failed. They returned to Ms. Wilson's home where Ms. Hughes was waiting. Ms. Hughes sorted through the stolen property. Mr. Shafer and Ms. Wilson then went back to the victim's home to steal one of the victim's cars. Mr. Shafer used the stolen car to drive to a separate location where he traded the victim's property for heroin, prescription narcotics, and $150. He used the money he acquired to buy methamphetamine from another person. Upon acquiring the drugs, Mr. Shafer drove back to Ms. Wilson's home where he, Ms. Wilson, and Ms. Hughes used the drugs.

The next day, Mr. Shafer returned to the victim's home with Ms. Hughes. They took jewelry, pills, a flat-screen television, and the victim's checkbook from the home. Within a week of the victim's death, Mr. Shafer and Ms. Hughes again went to the

victim's home to take the victim's second car. Mr. Shafer asserted that the victim's dog was alive during these trips. Mr. Shafer, Ms. Wilson, and Ms. Hughes pawned the victim's jewelry, sold one of the two cars for scrap, and Mr. Shafer used the victim's checkbook to write six checks to himself.

Sometime during the weeks following the victim's death, Mr. Shafer took the victim's mail, which had been accumulating in her mailbox, after Ms. Wilson told him she had seen a police officer near the house. A neighbor who was concerned that she had not seen the victim called the police. The police visited the victim's home twice but could see no evidence of foul play and noted that the victim's doors were locked.

A friend discovered the victim's decaying body on January 26, 2014. The friend had gone to the victim's home to check on her. When she arrived at the home, she found a door unlocked and went inside. In addition to finding her friend dead, the friend also found the dead body of the victim's dog. Police believed the dog's death was the result of neglect.

Mr. Shafer, Ms. Wilson, and Ms. Hughes were all arrested in connection with the victim's murder and the burglary of her home. Mr. Shafer was indicted on multiple felony charges, including first degree murder. The State made a plea offer to Mr. Shafer. The plea offer required Mr. Shafer to plead guilty to one count of first degree

4

murder in the commission of the felony offense for first degree robbery (felony murder),[1] one count of conspiracy, three counts of burglary by breaking and entering, and two counts of grand larceny. In exchange, the State agreed to recommend that the circuit court sentence Mr. Shafer to life with mercy on the felony murder charge. The State also agreed to stand silent on the issue of whether his sentences should run consecutive or concurrent to each other. Mr. Shafer accepted the plea offer.

A plea hearing took place on July 11, 2014. During the plea hearing, Mr. Shafer answered in the affirmative each time he was asked if he understood that the State's recommendations as to sentencing were not binding upon the court. By order entered on July 11, 2014, the circuit court accepted Mr. Shafer's guilty plea to one count of conspiracy, three counts of burglary by breaking and entering, first degree murder, and two counts of grand larceny.

The Division of Probation Services prepared a presentence investigation report in advance of sentencing. The report revealed that as a juvenile, Mr. Shafer was arrested and charged with breaking and entering for which he was sentenced to twenty-

---

[1] Specifically, the plea offer provided that Mr. Shafer would plead guilty to "the felony offense of Murder in the First Degree, to-wit: Murder in the Commission of the Felony Offense of First Degree Robbery." *See* W. Va. Code § 61-2-1 (1991) ("Murder . . . in the commission of, or attempt to commit . . . robbery . . . is murder in the first degree.").

5

four hours of community service. In addition to being charged with a string of driving related offenses between 2004 and 2011, Mr. Shafer was convicted for attempting to commit daytime burglary in 2010 and was placed on probation with day report programming, the terms of which he violated twice. Mr. Shafer also has an extensive history of illicit drug use and addiction. According to the report, Mr. Shafer left school in eighth grade but later acquired his GED and one college credit while incarcerated. The report concludes that Mr. Shafer would be likely to reoffend if he did not receive a very high level of supervision and treatment and that "he has little regard for human life."

A sentencing hearing was held on August 22, 2014. The circuit court heard statements from Mr. Shafer, parties' counsel, and family of the victim. Mr. Shafer told the court:

> I'd again like to apologize to the family. There's no excuse or reason for the things that happened. If I could take it all back, I would. I know that doesn't make anything right. I'll never be able to, to say exactly how sorry I am. At this time I just - - I'm ready to take my punishment because I know I did - - the things that I did was [sic] wrong. It was all over a stupid drug habit.

When asked by the court about "continuing to violate the decedent by going back to her home time after time after time," Mr. Shafer said:

> There is no excuse. I mean, I look back on things now that, you know, I, you know, I haven't done anything; and I look on things now and I just - - there is no excuse for the things that was [sic] done. There will never be any kind of excuse for any kind, any kind of behavior like that, whether it be on drugs or not on drugs, for anyone.

6

The State's counsel recommended that the court sentence Mr. Shafer to life in the penitentiary with mercy for his participation in the victim's murder. The State explained that the recommendation of mercy was based on Mr. Shafer's cooperation with the State in other criminal investigations, including those of his co-defendants.

A relative of the victim, Judy Cleary, asked the circuit court to sentence Mr. Shafer to life in the penitentiary without mercy. She gave the following statement:

> First and foremost, no apology will ever be accepted by this family. You made your choices, and now you must live with the consequences of your actions. . . .
> There are thousands of things I would like to say, but my breath would be wasted when it comes to the man in question. I do, however, want him to know that Nancy and her beloved dog, Hazel, may be an urn in the ground but they are together and they are at peace. He knows what happened that night in January. He was part of it, and he made a choice that put them there.
> I pray this murderer never has the same type of peace that they are experiencing together now. . . .
> Please, Judge Bloom, give this person the maximum that you can, and without mercy, for the choices he made on the way to a senseless murder of an innocent 66-year-old woman. My family and I have suffered enough.

Another relative, Sue White, made a similar request, stating:

> And to Judge Bloom, I just - - what he has done to our family, what he did to Nancy - -
> . . . .
> I just hope that you can throw, as they say on television, the book at him and throw away the key and just help the family heal, because this was such a horrific thing for

7

us, to happen to a 66-year-old woman, defenseless. And it's -
- please. Thank you.

Following Ms. White's statement, the Court told Mr. Shafer:

All right, Mr. Shafer, not only was this a very cold and horrible act that you committed, you compounded it by going back time after time. You had the opportunity when you committed your earlier crime that you ultimately went to the penitentiary for to get drug treatment and help. You had help while you were in the penitentiary. You ignored all of those opportunities. You needlessly, senselessly caused and participated in the death of this poor victim and caused this grief to this family. You set a great deal of unrest in this community because of the horrifying facts of this case.

It's the judgment of this Court you be sentenced to the penitentiary for the remainder of your natural life.

Pursuant to the circuit court's August 25, 2014, sentencing order, Mr. Shafer received an indeterminate sentence of one to five years for conspiracy, one to fifteen years on each conviction for burglary by breaking and entering, a life sentence without mercy for felony murder, and one to ten years on each conviction for grand larceny. The sentences were set to run consecutive to each other. The court did not order restitution.

On December 17, 2014, Mr. Shafer filed a motion pursuant to Rule 35 of the West Virginia Rules of Criminal Procedure,[2] requesting that the circuit court reconsider the sentence. Specifically, he requested that the court sentence him to life with mercy on the felony murder conviction and order that his sentences for the other convictions be set to run concurrently to each other. He did not allege that his sentence was illegal in this motion. By order entered January 12, 2015, the circuit court denied the motion, stating that "[t]he [c]ourt finds after consideration of the facts and circumstances that the sentence is proper."

Mr. Shafer now appeals his sentence to this Court.

## II. STANDARD OF REVIEW

In this appeal, Mr. Shafer only challenges the circuit court's sentence of life without mercy on the felony murder conviction. He alleges that the sentence is unconstitutional and that the circuit court abused its discretion in imposing the sentence. "'The Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands.' Syl. Pt. 1, in part, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997)." Syl. pt. 1,

---

[2] Rule 35 of the West Virginia Rules of Criminal Procedure allows a court to correct an illegal sentence at any time or to reduce a sentence when particular conditions set forth in the rule are met.

*State v. James*, 227 W. Va. 407, 710 S.E.2d 98 (2011). In applying this standard, we recognize that "[a]lthough this Court may not necessarily have obtained the same result had we been presiding over a case determined by a lower court, our mere disagreement with such a ruling does not automatically lead to the conclusion that the lower court abused its discretion." *State v. Allen*, 208 W. Va. 144, 155, 539 S.E.2d 87, 98 (1999). The lower court should only be overruled where the reviewing court has "'a firm conviction that an abuse of discretion has been committed.'" *Id.* (quoting *Jordache Enters., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 204 W. Va. 465, 473, 513 S.E.2d 692, 700 (1998)).

Additionally, we have held that "'[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review.' Syllabus Point 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982)." Syl. pt. 6, *State v. Slater*, 222 W. Va. 499, 665 S.E.2d 674 (2008).

## III. ANALYSIS

### A. Mr. Shafer's sentence does not violate the proportionality requirement in the West Virginia Constitution.

Mr. Shafer contends that his sentence of life without mercy for his felony murder conviction violates the proportionality requirement set forth in Article III, Section 5 of the West Virginia Constitution. This provision of our Constitution prohibits the infliction of "cruel and unusual punishment," and it mandates that, "[p]enalties . . . be

proportioned to the character and degree of the offence." *Id.*; *see also* syl. pt. 8, *State v. Vance*, 164 W. Va. 216, 262 S.E.2d 423 (1980) (recognizing that Article III, Section 5 of the West Virginia Constitution is the counterpart to the Eighth Amendment to the United States Constitution).[3] "As to the ordinary criminal statute, we have traditionally held that the Legislature has a broad power in defining offenses and prescribing punishments, limited in severity only by the constitutional prohibition against cruel or unusual or disproportionate sentences." *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 533, 276 S.E.2d 205, 211 (1981).

The Court uses two tests for determining whether a sentence violates the proportionality requirement set forth in our Constitution. *State v. Mann*, 205 W. Va. 303, 314–15, 518 S.E.2d 60, 71–72 (1999). The first test is subjective and requires that the Court determine whether the sentence "shocks the conscience and offends fundamental notions of human dignity." Syl. pt. 5, in part, *State v. Cooper*, 172 W. Va. 266, 304 S.E.2d 851 (1983). If the Court decides that the sentence shocks the conscience, then the Court need not proceed to the second test. *Mann*, 205 W. Va. at 315, 518 S.E.2d at 72. In determining whether a sentence shocks the conscience, we consider all of the circumstances surrounding the offense, the information contained in the presentence

---

[3] Mr. Shafer alleges that his sentence violates the West Virginia Constitution, but he does not allege that his sentence also violates the United States Constitution. Our analysis of the proportionality of his sentence is limited accordingly.

investigation report, and findings made by the trial court. *State v. Phillips*, 199 W. Va. 507, 513, 485 S.E.2d 676, 682 (1997). However, if the sentence is not subjectively unconstitutional, then the Court must proceed to examine the sentence using an objective test. *Id.* The objective test requires that the Court consider (1) "the nature of the offense," (2) "the legislative purpose behind the punishment," (3) how the punishment compares "with what would be inflicted in other jurisdictions," and (4) how the punishment compares to the punishments of "other offenses within the same jurisdiction." Syl. pt. 5, in part, *Wanstreet*, 166 W. Va. 523, 276 S.E.2d 205.

## 1. The subjective component.

Mr. Shafer contends that because Ms. Hughes selected the victim for the robbery, because he did not believe that harm would befall the victim, because he did not inflict the harm resulting in the victim's death, because he has been cooperative with investigators and the State, and because he was twenty-nine years old at sentencing, he should have been granted mercy. A sentence of life without mercy under these facts, Mr. Shafer says, shocks the conscience and offends fundamental notions of human dignity.

The State counters Mr. Shafer's argument by pointing to different facts: Ms. Hughes *and* Mr. Shafer targeted the victim, believing she was vulnerable because she had not reported prior robberies; Mr. Shafer intended to frighten the victim with a fake gun; he did not intervene to try to save the victim; he returned to the victim's home—

12

which contained the victim's decomposing body—multiple times to steal the victim's belongings; he attempted to thwart police investigation by taking the victim's mail; he left the victim's dog without care, and the dog died; he had a criminal history; and he had a substantial drug habit for which, when given the opportunity after his 2010 conviction to rehabilitate himself, he did not do so. The State asserts that "[a] sentence of life in prison for participating in cold and calculated actions which led directly to [the victim's] death, committed by a selfish, insensitive recidivist is not shocking to the conscience."

The circuit court characterized the facts of this case as "horrible" and "horrifying," noting that Mr. Shafer has compounded his participation in the victim's death by returning to the victim's home time after time to steal more of the victim's belongings. The court recognized that Mr. Shafer ignored opportunities to get help for his drug addiction, that he caused the victim's family to suffer, and that his actions greatly disrupted the community.

The punishment in the case at bar is similar to that imposed upon the defendant in *State v. Tesack*, 181 W. Va. 422, 383 S.E.2d 54 (1989). In *Tesack*, four participants, including defendant Franklin Tesack, orchestrated the burglary of the home of William Pearson and his wife. During the burglary, defendant Tesack served as the lookout and the getaway driver. *Id.* at 425, 383 S.E.2d at 57. When two of the participants had difficulty breaking into the home, they radioed defendant Tesack, and defendant

13

Tesack dispatched a third participant to aid the other two. *Id.* During the burglary, Mr. Pearson was wounded, and his wife was fatally shot. *Id.* at 424–25, 383 W. Va. at 56–57. Defendant Tesack was convicted of conspiracy, burglary, two counts of attempted robbery, felony murder, and assault during the commission of a felony. *Id.* at 425, 383 S.E.2d at 57. For the felony murder conviction, defendant Tesack was sentenced to life in the penitentiary without a recommendation of mercy, and this Court upheld that sentence. *Id.* at 428, 383 S.E.2d at 60 ("The portion of the circuit court's order sentencing the defendant to life in the penitentiary without a recommendation of mercy for [felony] murder . . . is affirmed.").

Mr. Shafer's actions are more egregious than defendant Tesack's. While both Mr. Shafer and defendant Tesack were involved in planning their respective burglaries, unlike defendant Tesack, Mr. Shafer was an active participant in the breaking and entering of the victim's home. Mr. Shafer threatened the victim, and he stood by as he watched Ms. Wilson kill the victim. After the victim's death, Mr. Shafer proceeded to return to her home to steal more of her belongings, and he stole the victim's mail to thwart police investigation.

With the strongest conviction, we conclude that the facts surrounding Mr. Shafer's involvement in the victim's death warrant the sentence imposed by the circuit court. Mr. Shafer's decision to target, threaten, and frighten a vulnerable, elderly woman

14

was calculated and deliberate. His repeated ransacking of the victim's home, his neglect of the victim's dog, and his attempt to thwart police investigation all show his utter disregard for the sanctity of life and his lack of remorse for his involvement in the victim's murder. Since before his incarceration in 2010, he has made little effort to conform his behavior to law, having chosen to perpetuate his drug habit and reject opportunities to alleviate his addiction. In light of the totality of Mr. Shafer's conduct, and given that his sentence falls within the statutory limits imposed for felony murder, the sentence imposed upon him does not shock the conscience or offend fundamental notions of human dignity. His heinous actions justify his permanent removal from society. Consequently, we must proceed by evaluating Mr. Shafer's sentence pursuant to the objective test set forth in syllabus point 5 of *Wanstreet*.

### 2. The objective component.

**a. The nature of the offense.** The crime connected to the sentence at issue—felony murder—is a felony. To commit this crime, another felony—arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance—must also be committed. W. Va. Code § 61-2-1. In this case, the underlying felony giving rise to the felony murder conviction is first degree robbery. With regard to robbery, the court has observed that "[r]obbery has always been regarded as a crime of the gravest character." *Mann*, 205 W. Va. at 315, 518 S.E.2d at 72 (quoting *State v. Glover*, 177 W.

15

Va. 650, 659, 355 S.E.2d 631, 640 (1987)); *see also State v. Ross*, 184 W. Va. 579, 582, 402 S.E.2d 248, 251 (1990) ("Aggravated robbery in West Virginia has been recognized as a crime that involves a high potentiality for violence and injury to the victim involved."). As a violent crime, the Court has observed that the Legislature "has provided circuit courts with broad, open-ended discretion in sentencing individuals for the offense[] of aggravated robbery." *Phillips*, 199 W. Va. at 514, 485 S.E.2d at 683; *see also State v. Woods*, 194 W. Va. 250, 254, 460 S.E.2d 65, 69 (1995) ("The Legislature chose not to deprive trial courts of discretion to determine the appropriate specific number of years of punishment for armed robbery, beyond ten." (internal quotation omitted)). Similarly, the Court has recognized that "first-degree murder is a most heinous crime" and that the Legislature has permitted the imposition of "the severest penalty in West Virginia" for that crime: life imprisonment without the possibility of parole. *State ex rel. Leach v. Hamilton*, 280 S.E.2d 62, 64 (W. Va. 1980).

Mr. Shafer attempts to mitigate the seriousness of the nature of his crime by arguing that his murder conviction did "not require a showing of malice, premeditation, or a specific intent to kill" on his part, and that "[t]here is a very low level of proof required for the state to obtain a conviction for felony murder." We are unmoved by Mr. Shafer's argument. The Legislature's intent is clear: The nature of felony murder, which is placed on par with all other types of first degree murder in West Virginia Code § 61-2-1, is equivalent to the nature of the other types of first degree murder. Furthermore, we

16

disagree with Mr. Shafer's contention that there is a low level of proof required to obtain a conviction for felony murder. On the contrary, to convict a defendant of felony murder, the State must prove the following elements: "(1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." *State v. Williams*, 172 W. Va. 295, 311, 305 S.E.2d 251, 267 (1983).

**b. The legislative purpose behind the punishment.** West Virginia Code § 61-2-2 (1965) and § 62-3-15 (1994) provide that the sentence for a conviction for first degree murder is confinement in a penitentiary for life. However, if granted mercy, a defendant may become eligible for parole after serving at least fifteen years of his sentence. W. Va. Code § 62-3-15. The harsh penalty for first degree murder reflects the seriousness of the crime. *Cf. Mann*, 250 W. Va. at 316, 518 S.E.2d at 73. While this Court has never spoken directly to the Legislature's purpose in providing such a harsh penalty, other jurisdictions have recognized that "[a]n obvious purpose of the felony murder statute, or any murder statute, is to protect human life." *State v. Greco*, 579 A.2d 84, 91 (Conn. 1990); *see also Talancon v. State*, 721 P.2d 764, 768 (Nev. 1986) ("[T]he felony murder statute seeks to protect against homicides."). This is accomplished through punishment and deterrence. *See Todd v. State*, 884 P.2d 668, 686 (Alaska Ct. App. 1994) ("[I]f the increased punishment for an unintended homicide does not deter people from

committing dangerous felonies, it will at least encourage criminals to plan and carry out such crimes with increased regard for physical dangers." (internal quotation omitted)); *Santiago v. State*, 874 So. 2d 617, 621 (Fla. Dist. Ct. App. 2004) ("[T]he purpose of the felony murder statute [is] to protect society by imposing just punishment and, perhaps to some degree, deter future crime . . . .").

At common law, "the commission of, or the attempt to commit, any felony which resulted in a homicide was deemed murder." *State v. Sims*, 162 W. Va. 212, 221, 248 S.E.2d 834, 839 (1978). Further, at common law, "all murder was punishable by death." *Id.* at 221, 248 S.E.2d at 840. By limiting the felonies that may provide the basis for a felony murder conviction, the Legislature specifically delineated the crimes that are of such a serious nature as to warrant punishment as first degree murder when the commission of those crimes results in a victim's death. *See id.* (observing that the Legislature "establish[ed] categories of the common law crimes of murder for the purpose of setting degrees of punishment"). The Legislature intended that a killing occurring during a robbery be punished as first degree murder, even where the killing was not intended by the defendant. *See id.* at 228, 248 S.E.2d at 843 ("No case, either from this Court or from the Virginia court, has ever broken from the historical common law precedent to suggest that proof of an intentional killing is an element of the felony-murder crime.").

18

**c. A comparison of the punishment with other jurisdictions.** The vast majority of states permit prosecution for felony murder. *But see Garringer v. State*, 909 P.2d 1142, 1148–49 n.11 (Haw. 1996) (noting that Hawaii's felony murder statute was repealed); *Bennett v. Commonwealth*, 978 S.W.2d 322, 327 (Ky. 1998) ("With the adoption of the penal code, the felony murder doctrine was abandoned as an independent basis for establishing an offense of homicide in Kentucky."); *People v. Aaron*, 299 N.W.2d 304, 324 (Mich. 1980) (abolishing the common-law doctrine of felony murder). Of these states, most recognize robbery as a predicate to the crime, and they permit the penalty provided under West Virginia law: life imprisonment. *See, e.g.*, Colo. Rev. Stat. § 18-1.3-401 (2015) (providing that the minimum sentence for a Class 1 felony is life imprisonment); Colo. Rev. Stat. § 18-3-102 (2000) (defining felony murder as a Class 1 felony); Ga. Code Ann. § 16-5-1 (2014) (permitting life imprisonment for felony murder). While West Virginia does not have the death penalty, other states permit the death penalty—a greater punishment than life imprisonment—for felony murder. *See, e.g.*, Colo. Rev. Stat. § 18-1.3-401; Ga. Code Ann. § 16-5-1. In the jurisdictions that recognize felony murder, the punishment for the crime varies depending on the specific facts of the case. Mr. Shafer's conduct is comparable to conduct in other jurisdictions that has provided the basis of a life without mercy sentence. *See, e.g.*, *Skinner v. State*, 575 A.2d 1108 (Del. 1990) (sentencing a defendant to life imprisonment without the possibility of parole where, during a robbery, a codefendant killed the victim); *People v. Perkins*, Nos. 259865, 259866, 260161, 2006 WL 1330320 (Mich. Ct. App. May 16,

2006) (sentencing a defendant to life imprisonment without the possibility of parole where, during a robbery, a codefendant killed the victim); *cf. State v. Bonnett*, 502 S.E.2d 563 (N.C. 1998) (upholding a death sentence for felony murder premised on robbery where the homicidal act was committed by a codefendant); *Dutton v. State*, 188 S.E.2d 794 (Ga. 1972) (granting mercy for felony murder where defendant, the driver during the burglary, learned from his companions when they returned to the vehicle that they had committed the homicide).

**d. A comparison of the punishment with other offenses within the State.** In our evaluation of this factor of the objective test, we begin by noting that we have held that "[l]ife imprisonment without possibility of parole is not cruel and unusual punishment for first-degree murder. U.S.Const. amends. XIV and VIII; W.Va.Const. art. III, s 5." Syl. pt. 1, *Hamilton*, 280 S.E.2d 62. Aside from first degree murder, which includes felony murder, the only other crime that mandates a life sentence in West Virginia is kidnapping. W. Va. Code § 61-2-14a (2012). Mercy, which carries the possibility of parole, may be withheld in sentencing for either crime.

A defendant can also receive an effective life sentence for certain crimes. For instance, a conviction for robbery requires a minimum sentence of ten years incarceration, but the controlling statute does not place an upper limit on the sentence that may be imposed. W. Va. Code § 61-2-12 (2000); *see also State v. England*, 180 W. Va.

342, 356, 376 S.E.2d 548, 562 (1988) (affirming a life sentence with the possibility of parole after ten years for aggravated robbery where the defendant had a criminal history, and the defendant presented a firearm and fired three shots during the course of the robbery); *Glover*, 177 W. Va. at 659, 355 S.E.2d at 640 (upholding defendant's seventy-five year sentence for aggravated robbery where defendant had a criminal history spanning twenty years, his victim nearly died, and the presentence report described him as "repeatedly violent" and a "danger to society"). Under certain circumstances, a conviction for sexual assault can result in a sentence of twenty to one hundred years of incarceration. W. Va. Code § 61-8B-3 (2006). While the punishments for almost all offenses in West Virginia provide for less than a mandatory life sentence, the life sentence for felony murder reflects the severity of the crime. *See Sims*, 162 W. Va. at 221, 248 S.E.2d at 840.

In examining the punishments available in West Virginia for other offenses, the Fourth Circuit of the United States Court of Appeals asked in *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973), whether the court could be rationally urged that the defendant was "as dangerous to society and as deserving of punishment as the murderer . . . and kidnapper." *Id.* at 142. As discussed in detail above, the nature of Mr. Shafer's offense was violent, heinous, and of the gravest character; the Legislature has intended that killings incident to robberies be punished like all other first degree murder; other jurisdictions have permitted punishment for the same crime under similar circumstances;

21

and his participation in the events surrounding the killing committed during the robbery of the victim is the type of behavior that indicates Mr. Shafer is a danger to society and deserving of punishment as a murderer. Objectively, his sentence is proportional to his crime.

## B. The circuit court did not abuse its discretion by rejecting the State's recommendation of mercy.

This Court grants substantial deference to a lower court's sentencing decisions. As established *supra*, when the sentence at issue is within statutory limits and is not tainted by an impermissible factor, we defer to the circuit court's ruling. Mr. Shafer does not dispute that his sentence falls within the statutory limits for his crime, and he does not contend that the circuit court relied on an impermissible factor in sentencing him.

Mr. Shafer argues that the circuit court failed to give "any justifiable basis" for its sentencing decision aside from the court's recognition that he failed to treat his drug problem. We disagree. First, the circuit court made a determination that Mr. Shafer committed "a very cold and horrible act." Mr. Shafer contends that the cold and horrible act resulting in the victim's death was committed not by him but by Ms. Wilson. Mr. Shafer's argument overlooks his participation in the events leading up to the killing, including threatening the victim with a toy gun and standing by as Ms. Wilson threatened

and stabbed the victim with a knife. These acts of Mr. Shafer are certainly cold and horrible.

Second, the circuit court determined that Mr. Shafer's return to the victim's home was another aspect of his participation in the killing. Mr. Shafer argues that the fact that he returned to the home after the murder should not justify his sentence of life without mercy because his other sentences were related to his return to the home. On the contrary, we find that Mr. Shafer's repeated return to the victim's home shows he lacked remorse for his involvement in the victim's death.

Third, the circuit court determined that Mr. Shafer "caused and participated in the death" of the victim. He planned the initial robbery with Ms. Wilson and Ms. Hughes, and he and Ms. Wilson carried out that plan. While he may not have dealt the deathblows to the victim, the victim and her dog might still be alive were it not for his participation in planning and carrying out the robbery.

Finally, the circuit court determined that Mr. Shafer's actions harmed more than just the victim; his participation in the victim's murder "caused this grief to this family." All of the court's given justifications support its decision to withhold mercy in this case.

## IV. CONCLUSION

The circuit court's August 25, 2014, order sentencing Mr. Shafer to life in the penitentiary without mercy for his felony murder conviction does not offend the Constitution and does not constitute an abuse of the circuit court's discretion.

Affirmed.